**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal Case No. 23-cr-122 (APM)** |
| **v.** | : | |
| | : | |
| **STEVEN PRICE, *et al.*,** | : | |
| | : | |
| **Defendant.** | : | |

# GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submit this memorandum to aid the Court in sentencing Defendant Steven Price ("Price" or "Defendant") and to provide the Government's recommendation for sentencing, which is currently scheduled for September 17, 2026.

For years, Defendant defrauded a program meant to help our society's most vulnerable members. He drove luxury cars and took international vacations using the hundreds of thousands of dollars per year he paid himself from his dental practice, all the while stealing from public coffers by billing D.C. Medicaid for dental services that did not happen. He violated a position of trust with his patients and D.C. Medicaid and ensnared other dental professionals into his scheme. He was found guilty by a jury of his peers. The Government respectfully recommends that the Court impose a sentence of **108 months' imprisonment,** and a three year term of supervised release, along with restitution to D.C. Medicaid and a criminal forfeiture money judgment.

## I. INTRODUCTION AND OVERVIEW

Since at least 2010, Defendant Steven Price was an approved D.C. Medicaid provider, and his practice, The Smile Center of Washington, D.C. ("Smile Center"), serviced a special patient population including the elderly and patients with various special physical and mental health needs. The evidence at trial demonstrated that from January 2017 through March 2022, Defendant

Price and Co-Defendant Keidi Moore ("Moore" or "Co-Defendant") conspired to conduct a scheme to defraud Medicaid of millions of dollars by using their patients' dental records to submit false claims to Medicaid. They conducted their scheme day in and day out, month after month, for years by creating false entries in hundreds of patients' dental records, which were then used to submit false and fraudulent claims to D.C. Medicaid seeking payment for dental services that they did not provide. The evidence and testimony at trial showed that Price repeatedly chose to bill for services he knew were not rendered and that he reaped significant financial benefits from the conspiracy and scheme.

D.C. Medicaid relies upon its approved dental providers to provide quality dental services to beneficiaries of Medicaid. As a result, Medicaid providers are trusted by Medicaid to be upfront and honest about what services they claim and ask for reimbursement. The trust placed on Medicaid providers is particularly important due to the sheer volume of health care benefits provided each month in the District of Columbia. Price abused Medicaid's trust when he entered false information in patients' charts for services not rendered and approved false entries made by his co-defendant before submitting false claims to Medicaid.

Defendants' abuse of trust also extends to the Smile Center's dental patients and Medicaid beneficiaries. Each patient whose charts contained false information now has incomplete and inaccurate dental records regarding the care and treatment provided to them at the Smile Center. A patient's history and prior treatment is important in determining future dental treatment – given the extent of the false entries, patients may never know the true extent of the treatment or non-treatment they received from the Smile Center. Further, patient witnesses testified how knowledge of the Defendants' scheme caused distress.

To reflect the seriousness of Defendant's offenses, his knowing, willful, and voluntary exploitation of his position of trust, his complete lack of remorse, and to deter him and others from engaging in such behavior in the future, the Government recommends that the Court impose a term of incarceration at the low end of the U. S. Sentencing Guidelines ("U.S.S.G.") range (108 months to 135 months) based on a total offense level of 31 for the offense, which is within Zone D of the Guidelines. *See* PSR at ¶¶ 86, 95. A sentence of 108 months' imprisonment – the bottom of that Guideline's range, along with the imposition of a term of 36 months supervised release, is appropriate considering the U.S.S.G. calculation and all of the 18 U.S.C. § 3553 factors the Court should review and consider. The Government is also requesting that the Court order Defendant to pay full restitution to Medicaid in the amount of $3,726,529. Pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 9982(a)(7), and 28 U.S.C. § 2461(c), and because Defendant received proceeds of the conspiracy and fraud scheme, the Court should impose a criminal forfeiture money judgement in the amount of $3,726,529. There are also $2,100 in special assessments mandated by 18 U.S.C. § 3013(a)(1)(A)(iii), (a)(2)(A), that Defendant should be ordered to pay. Such a sentence would be sufficient but not greater than necessary to comply with the purposes of sentencing.

## II. PROCEDURAL HISTORY

On April 13, 2023, a federal grand jury in Washington D.C. returned a 21-count Indictment charging Defendants Price and Moore with conspiracy, in violation of 18 U.S.C. § 1349, health care fraud, in violation of 18 U.S.C. §1347; false statements relating to health care matters, in violation of 18 U.S.C. § 1035(a)(2); wire fraud, in violation of 18 U.S.C. § 1343; and aiding and abetting and causing an act to be done, in violation of 18 U.S.C. § 2. *See* ECF No. 1. The Indictment also contained a forfeiture allegation. *Id.*

A jury trial commenced on January 20, 2026. On March 4, 2026, after a nearly six-week

trial, involving over thirty-five witnesses, including former patients and employees, law enforcement agents, and fact and expert witnesses, a jury found Price guilty of all counts in the 21-count indictment, charging conspiracy to commit healthcare fraud and wire fraud, healthcare fraud, false statements relating to healthcare matters, and wire fraud.[1] Price is scheduled to be sentenced on September 17, 2026, at 10:00 a.m. in Courtroom 10.

## III. FACTUAL BACKGROUND

The Indictment alleged *inter alia* that Defendant Price was the owner of The Smile Cetner, PLLC, aka: The Washington Smile Center ("Smile Center"), a dental practice in Washington, D.C., which was initially located on Kennedy Street N.W. and later moved to Cedar Street N.W. PSR ¶ 8. D.C. Medicaid provided payment/reimbursement for dental services based upon claims submitted by Price and the Smile Center as approved Medicaid providers. *Id.* ¶ 9. Price and other Smile Center employees were required to create and maintain dental records reflecting purported care and treatment of Medicaid beneficiary patients. *Id.* ¶ 10. Price required the Smile Center's office manager to submit claims to Medicaid under his Medicaid number and that they were based upon entries for dental service reflected in patients' records entered by Price, Co-Defendant Moore and other associated dentists. *Id.* ¶ 11.

At trial, the Government put on evidence from D.C. Medicaid showing that Price conspired with his dental hygienist, Co-Defendant Moore to submit millions of dollars' worth of fraudulent claims to D.C. Medicaid under two ADA CDT codes:[2] clinical crown lengthening ("CCL" or

---

[1] Co-Defendant Moore was convicted of 16 of the 21 counts in the Indictment. ECF No. 189.

[2] Most dental providers and health care benefit programs, including Medicaid, use the American Dental Association's Current Dental Terminology codes ("CDT" codes), to define dental services and appliances.

"D4249") and fixed unilateral space maintainer ("SM" or "D1510").[3] Price's millions of dollars in billing for these two dental services dwarfed other Medicaid providers serving the same community—all of whom had similarly-sized, or even larger, practices. For example, as shown in Government's Exhibit No. 600-53, below, which was admitted into evidence at trial, Price was the highest reimbursed provider in D.C. for D4249 in years 2018 to 2021—and the next nine-highest reimbursed Medicaid providers for D4249 billed a mere fraction of Defendant Price's numbers.




According to FOA O'Neill's summary data and testimony, Medicaid paid $3,558,178 for D4249 claims including 11% of CCL procedures that had records showing a restorative procedure within 60 days of the CCL code being entered. Gov. Ex. 600-52. Adjusting to make a

[3] A clinical crown lengthening was defined by the ADA as a procedure "employed to allow a restorative procedure on a tooth with little or not tooth structure exposed to the oral cavity. Crown lengthening requires reflection of a full thickness flap and removal of bone, altering the crown to root ration." Gov. Ex. 801. A fixed, unilateral space maintainer is a metal bank cemented to a tooth to allow space for the eruption of an adult tooth in children. 2/2/2026 Tr. 1043.

conservative estimate that includes giving credit for these 11% of claims (that is, subtracting $391,399 from the total paid), the total claims paid out for false D4249 claims is $3,166,778.

The Government provided similar evidence from D.C. Medicaid related to billing for D1510. *See Gov.* Ex. 600-50. The Smile Center was also an outlier regarding claims for D1510 code.




| Procedure Code | Procedure Code Description |
|---|---|
| D1510 | Space Maintainer – Fixed, Unilateral – Per Quadrant |

Footnotes:

1. Source: Listing from DHCF of the highest reimbursed providers of procedure code D1510
2. Time Period Covered: 2016 - 2021
3. This shows the amount reimbursed by DC Medicaid for the top 10 highest reimbursed providers for procedure code D1510 for each year. The highest reimbursed providers may not be the same providers each year.

GOVERNMENT EXHIBIT
600-50

There was testimony at trial that the false claims filed under D1510 totaled approximately $559,751, with only one patient being under the age of 21 years – the average age of patients purportedly receiving these dental appliances was fifty. Gov. Ex. No. 600-49.

Evidence admitted in the Government's case-in-chief from the Smile Center's dental records software program, Open Dental, showed that both Defendants Price and Moore entered

thousands of procedures each under codes D4249 and D1510 for patients of The Smile Center that did not occur. *See e.g.,* Gov. Exhibit Nos. 201-210, 600-55, 722. Summary exhibits provided information regarding both the creation and deletion of D1510 and D4249 entries in the Open Dental records. *See e.g.,* Redacted Gov. Exhibit Nos. 600-55 below; 2/9/2026 Tr. 2335.

**Total Number of Entries for D4249 & D1510**
**Attributable to Each User**

| User | Activity | 2017 | 2018 | 2019 | 2020 | 2021 | 2022* | TOTAL |
|---|---|---|---|---|---|---|---|---|
| drprice | Created | 905 | 2,906 | 2,870 | 1,575 | 342 | 8 | 8,606 |
| | Deleted | 19 | 319 | 350 | 86 | 21 | | 795 |
| Kmoore | Created | 93 | 768 | 2,566 | 1,735 | 1,012 | 6 | 6,180 |
| | Deleted | 43 | 470 | 636 | 176 | 95 | 14 | 1,434 |
| A[redacted] | Created | 11 | 11 | 3 | 11 | 6 | 2 | 44 |
| | Deleted | 61 | 300 | 432 | 106 | 35 | 2 | 936 |
| N[redacted] | Created | | | 10 | 31 | | | 41 |
| | Deleted | | | 13 | 2 | | | 15 |
| M[redacted] | Created | | | 21 | 8 | | | 29 |
| KK[redacted] | Created | | | | 24 | | | 24 |
| | Deleted | | | | 1 | | | 1 |
| F[redacted] | Created | | 5 | 2 | | | | 7 |
| | Deleted | | 4 | 11 | | | | 15 |
| Y[redacted] G[redacted] | Created | | | | | 2 | 8 | 10 |
| s[redacted] | Created | | | | | 1 | | 1 |
| | Deleted | | | | 2 | 1 | | 3 |
| O[redacted] | Created | | | 2 | | | | 2 |
| S[redacted] | Created | 1 | | | | | | 1 |

| Procedure Code | Procedure Code Description |
|---|---|
| D1510 | Space Maintainer – Fixed, Unilateral – Per Quadrant |
| D4249 | Clinical Crown Lengthening - Hard Tissue |

Footnotes:

1. Source: Open Dental audit trail
2. Time Period Covered: 1/1/2017 – 3/22/2022

*See also* Government's Exhibit No. 600-59. As reflected in this exhibit, both Defendants created a significant number of entries for D4249 and D1510 codes, particularly compared to the other dentists. This exhibit also shows that both Defendants deleted some of their entries.[4] *See id*. Audit trails from individual patient charts showed that the codes D4249 and D1510 for clinical crown lengthening and fixed unilateral space maintainers were often entered by Moore during routine appointments for dental hygiene services, such as cleanings and fluoride treatment, *see, e.g.*, Gov. Exhibit. No. 202 (audit trail of Patient No. 5126 at 58), while Price entered some codes during appointments, some after business hours, and/or when other dentists saw patients *see, e.g.*, Gov. Exhibit Nos. 205, 207. Records also demonstrated that during the fraud scheme, Defendants created entries for D4249 and D1510 on the same patient multiple times and frequently on the same tooth. *See* Government Exhibit No. 206-3 below.[5]

Patient witnesses from The Smile Center testified and confirmed that they did not recall undergoing the types of procedures Defendants entered into their records. One witness recalled viewing her patient history containing procedures she did not recognize and reacting "that [expletive] was crazy!" *See* 1/30/2026 Tr. 947. Several former employees of The Smile Center testified, including two who recalled seeing patients and then later realizing that Defendant Price

[4] There is no evidence in the record as to why either Defendant deleted entries other than the officer manager's testimony that the early deletions by her and Defendant Moore were: 1) to avert Co-Defendant Price from getting in trouble for perpetrating the fraud scheme; and 2) to avoid too many D1510 codes so as to not be detectable to Medicaid. *See* 2/10/2026 Tr. 2749, 2751, 2754-57.

[5] The individual mouth charts admitted into evidence, such as Gov. Exhibit No. 206-3 were visual summaries of data contained in patients' dental record and showed the number of the entries that were ultimately billed to Medicaid for that patient, and included the purported: date, tooth number, type of dental service - (CCL) for D4249 and (SM) for D1510, and identity of username - (KM) for Defendant Moore and (SP) for Co-Defendant Price. *See e.g.* Gov. Exhibit Nos. 201-3A, 206-3; 2/11/2026 Tr. 3061-3064.

had added codes for D4249 into their patient charts (even though no clinical crown lengthening procedures had occurred during the appointments). *See e.g.,* Gov. Exhibit No. 205; 2/3/2026 Tr. 1399-1405.

Multiple dental providers testified that that CDT Code D1510 was for a fixed unilateral space maintainer – a metal band with a wire to hold open space for an erupting adult tooth in children. *See e.g*. 2/2/2026 Tr. 1043. The appliance was cemented onto a tooth. *Id*. The Smile Center staff knew that the D1510 code was for a fixed mouth appliance for children. *See* 2/3/2026 Tr. 1450; 2/4/2026 Tr. 1553. Moore created more than $500,000 worth of D1510 entries for adults whose average age was 50, and Price approved those claims to be submitted to Medicaid. *See* Gov. Exhibit Nos. 600-49, 600-50. Notably, the in-house lab did not make SM, nor were they ordered from a dental supply company. PSR ¶ 16(e). Moreover, patient records did not contain entries for the removal of SM appliances regarding patients who purportedly received them *Id*. ¶ 16(g).

Dental health providers, including the Government's expert witness, periodontologist Dr. Martyn Green, testified that the purpose of a D4249, or the CCL procedure, was to elongate the tooth by removing gum tissue and bone so there was more tooth structure exposed to place a crown or filling. 2/2/2026 Tr. 1024-1026. Dr. Green testified that a CCL should not be done without subsequent restorative procedure. *Id.* at 1026. According to the Government's experts and the American Dental Association's CDT Code, the D4249 Code requires the creation of a flap in the gum and exposing the tooth root and removal of bone.[6] 1/30/2026 Tr. 837-838. *See e.g.* Gov. Exhibit No. 801; 2/2/2026 Tr. 1061. Dr. Lacey also testified that he would expect a restorative

[6] Defendant Price's expert agreed that D4249 Code states that a flap is part of the CCL procedure, but that he did not agree with the American Dental Association's codes. 2/17/2026 Tr. 4041.

procedure after a clinical crown lengthening. 1/30/2026 Tr. 849-850. Indeed, the CDT Code manual describes D4240 clinical crown lengthening as "[t]his procedure is employed to allow a restorative procedure on a tooth with little or no tooth structure exposed. . . crown lengthening requires reflection of a full thickness flap and removal of bone, altering the crown to root ratio. . ." Gov. Exhibit No. 801. The Smile Center's patient records, however, showed that only 11 % of the CCL procedures were followed by an expected restorative procedure, such as a crown or a filling, within 60 days of the CCL procedure. *See* Government's Exhibit No. 600-52. Dentists also testified that they would not expect a patient to have a CCL procedure the same day as a hygiene treatment such as teeth cleaning. 2/2/2026 Tr. 1033; 2/2/2026 Tr. 1076. Dr. Green also testified that a D4249 and D1510 should not be done on the same day. 2/3/2026 Tr. 1046. "You wouldn't want any cement to get under the flap or irritate the surgery from healing." *Id*.

Importantly, Price and Moore entered or caused to be entered the same "cloned" non-individualized purported progress notes for D4249 entries, which also had the same diagnosis for every patient who purportedly had the CCL procedure, "Chronic Periodontitis" which was generally contraindicated for CCL procedures because the CCL procedure should be performed in a health mouth environment. PSR ¶ 16(b).

Price and Moore also made entries in patients' records claiming to have provided multiple CCL and SM procedures on the same patient, sometimes on the same day. See example below:




A similar pattern was seen throughout the Smile Center's patients' records. *See e.g.*, Gov. Exhibit Nos. 201-3A, 202-3, 203-2A, 204-3A, 205-3, 207-3A, 209-3A, 210-2A.

In addition, records showed that Defendants had started these patterns in approximately 2018—after they had been working together at The Smile Center for several years before that, without entering the two codes so frequently — and they both stopped entering the two codes at the same time in August 2021, when D.C. Medicaid let Price know that going forward, D4249 had a pre-authorization requirement. *See, e.g.*, Gov. Exhibit Nos. 3-17 (August 2, 2021, email from D.C. Medicaid to Price regarding pre-authorization requirement); Gov. Exhibit No. 600-75 (D4249 entries by Defendants in 2021), and Gov. Exhibit Nos. 600-73 (D1510 entries by Defendants in 2021). Although there was no pre-authorization requirement for claims involving D1510, both Defendants stopped making entries for D1510.

Associate dentists and the Smile Center's office manager testified that they noticed Price entering codes for procedures that had not occurred in patients' charts.[7] *See e.g*. 2/4/2026 Tr. 1559-1561; 2/9/202 Tr. 2424-27; 2/9/2026 Tr. 2439. The office manager talked to Price about it, but he never gave her a straight answer. 2/9/2026 Tr. 2413-2436. The office manager also testified about printing a report (of the Smile Center's daily entries) from Open Dental and going over the report with Moore "because [Defendant Moore] would have more knowledge on whether a procedure should be done or not done than I would . . . she would say, it's no way you could have done that or this couldn't have been done." 2/9/2026 Tr. 2436. Early on in Price's scheme to defraud Medicaid, the officer manager and Moore reviewed the daily reports, and they deleted entries that they knew were fraudulent. 2/9/2026 Tr. 2429-3.

Yet, Moore began adding procedures to patients' charts too. "Well, yes, she was adding procedure codes as well . . .she was adding the code – it was like an ortho code [] . . . [i]t was the same code over and over" *Id*. at 2437. In addition, the office manager testified that ". . .I mentioned to her [Defendant Moore] that I thought she was overusing that code and that she might want to stop." *Id*. at 2438. When the office manager raised these concerns of Moore's excessive use of D1510 code with Moore she responded, "Why?" 2/9/2026 Tr. 2493. The office manager responded, "I hold her, you know, they might start getting flagged through Medicaid because it seems like she is using it an excessive amount of times." *Id*. After this discussion with Moore, Price approached her and responded on Moore's behalf, "Then as soon as she told Dr. Price, because he came to me and he said that Keidi had mentioned to him what I said, he said she could justify it. So, I said, okay." *Id*. at 2494.

[7] There was evidence from the records and testimony that the Defendants' scheme to defraud began when the Smile Center was located on Kennedy Street. *See e.g*., 2/3/2026 Tr 1454; Gov. Exhibit No. 722.

In total, taking a conservative approach in determining the loss amount to D.C. Medicaid, D.C. Medicaid paid the Smile Center $3,726,529 during the time relevant to the indictment for just D4249 and D1510 false claims.

## IV. STATUTORY PENALTIES

Each count of wire fraud (Counts 13-21) has a statutory maximum punishment of twenty years' incarceration. 18 U.S.C. § 1343; PSR ¶ 30, 85. The maximum statutory punishment on Counts 1 and 2 – conspiracy to commit health care fraud, and health care fraud – is ten years' incarceration. PSR ¶ 83. Counts 3-12 – false statements relating to a health care matter's maximum statutory penalty is five years' incarceration. 18 U.S.C. § 1035(a)(2); PSR ¶ 84.

## IV. THE APPLICABLE SENENCING GUIDELINES RANGE

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for a sentencing determination. *Gall v. United States*, 552 U.S. 38, 49 (2007*); see also United States v. Cano-Flores*, 796 F.3d 83, 90 (D.C. Cir. 2015) ("[T]he first step for the sentencing court is to calculate the [Sentencing Guidelines] range"). While 18 U.S.C. § 3553(a) instructs the Court to "impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth" in 18 U.S.C. § 3553(a)(2), the defendant's Guidelines range is one factor the Court must consider in determining an appropriate sentence. 18 U.S.C. § 3553(a)(4). Facts supporting the base offense level and any enhancements are proven by the government by a preponderance of the evidence. *See, e.g.*, *United States v. West*, 392 F.3d 450, 454 (D.C. Cir. 2004).

According to the Presentence Report, the U.S. Sentencing Guidelines calculation for Defendant's offenses are grouped based upon the highest charge of wire fraud and aiding and

abetting and causing an act to be done, in violation of 18 U.S.C. § 1343(2) and 2. 3D1.2; PSR ¶ 28-30.

The Government concurs with U.S. Probation's Guidelines' calculation as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2B1.1(a)(1) | Base Offense Level | 7 |
| U.S.S.G. § 2B1.1(b)(1)(J) | Loss Amount +$3,500,000 | +18 |
| U.S.S.G. § 2B1.1(b)(7) | Health Care Fraud +1,000,000 | +2 |
| U.S.S.G. § 3B1.3 | Abuse of Position of Trust | +2 |
| U.S.S.G. § 3B1.1(c) | Organizer/Leader, other than | +2 |
| | Total | 31 |

Because there are multiple counts that are closely related, pursuant to U.S.S.G. §3D1.2, there is only one group. Therefore, the combined offense level is 31. The PSR writer also concluded (and the Government agrees) that Price has a criminal history score of zero, putting him in Criminal History Category I. The Government will discuss below why the Guidelines enhancements under U.S.S.G. §§ 3B1.3 and 3B1.1(C) apply to Price's guidelines' calculation as well as how they factor into the Court's consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a).

Price does not warrant any reductions in offense level under the U.S. Sentencing Guidelines. Price has not demonstrated any acceptance of responsibility, so he does not qualify for a reduction under U.S.S.G. §3E1.1. Moreover, because he was a leader and organizer of the criminal conduct and receives an enhancement pursuant to U.S.S.G. § 3B1.1, he is ineligible for a Zero-Point Offender Adjustment. *See* §4C1.1(a)(10). The total offense level under the U.S.S.G. is a level 31 (corresponding to a range of 108 months to 135 months' incarceration).

## V. RECOMMENDATION

### A. Analysis of the Sentencing Factors Under Section 3553(a)

After calculating the applicable Guidelines range, the Court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007). The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the Guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7).

#### 1. Nature and Circumstances of the Offense and Its Seriousness

Price and Moore's fraudulent scheme was not a one-off event nor a crime of opportunity—it was a deliberate concerted scheme, where each committed numerous specific criminal acts of false misrepresentations over a period of years. And Price was the mastermind of the conspiracy that affected not only Medicaid but hundreds of Medicaid beneficiaries and Smile Center employees. The nature and circumstances of Price's criminal activity demonstrate his clear criminal intent to defraud D.C. Medicaid of millions of dollars and in doing so, abused the trust put in him by Medicaid and his patients.

Price had final say over the entirety of the scheme because he had authority over the claims submitted to Medicaid and his employees, whether that was his office manager, the associate dentists, or Co-Defendant Moore. That is not to say that Co-Defendant Moore was not responsible for her own actions in working with Price to enter false information in patients' records, but the evidence at trial showed Price to be the driving force of the scheme and the one who benefitted most from it financially. Price was the individual who, when asked about the false billing by employees, tried to divert their attention and hid the false claims behind purportedly performing gum procedures using a laser. Co-Defendant Moore is not the only employee Price ensnared. He recruited young female dentists out of dental school or early in their careers then purported to "mentor" them all the while he was using the dental records of patients they saw to add false entries in order to submit false claims to Medicaid. If there were any questions about who was the mastermind of the scheme, one need look no further than who controlled the proceeds of the crime –who bought luxury vehicles, took international vacations, and purchased and renovated a home worth over $1 million. At the end of the day, this scheme would not have existed at all but for Price's actions, and the aggravating role enhancement under U.S.S.G. § 3B1.1(c) is appropriate. Because Price's Guidelines' calculation should include the aggravating role enhancement under § 3B1.1(a), he is ineligible for the "zero-point offender" reduction under § 4C1.1. *See* U.S.S.G. § 4C1.1(a)(10).

Price was in a trusted position having been approved as a Medicaid provider – someone who was privileged to treat the District's most vulnerable citizens, including the impoverished, elderly, and physically/mentally disabled. As a Medicaid provider, he had a trusted position that came with responsibilities to the public and the government. He had a duty to treat Medicaid beneficiaries to individualized and particularized dental care and treatment. Instead, he chose to

use his position and access to Medicaid to make over $10 million from claims to Medicaid – over $3.7 million of which were for billing false D4249 and D1510 claims. Price's and Moore's scheme lasted for approximately four years, was highly effective, and Price gained significant funds at the expense of a U.S. government program designed to assist the most vulnerable of District residents.

Price abused the trust placed in him when he entered false information regarding procedures/appliances into hundreds of patients' dental records and in doing so, did not provide accurate medical histories of patients' dental conditions and treatments. Price's criminal acts of entering false records is particularly egregious because the Smile Center's patients' records are not reliable and patients and their future providers simply have no way of knowing what treatments were actually provided or have accurate information about their dental health. By falsifying hundreds of patients' records and neglecting to provide individualized notes, Price and Moore rendered the Smile Center's patients' records virtually worthless. Indeed, evidence of Price's (and Moore's) criminal acts was spread far and wide throughout the records. As a result of Price's abuse of the trust placed in him by Medicaid, his patients, and employees, a two-level enhancement under U.S.S.G. § 3B1.3 is appropriate.

The financial loss to Medicaid was substantial – as discussed above, the Government has conservatively[8] estimated that Defendants caused a total loss of at least $3,726,529, based upon what Medicaid actually paid the Smile Center (and not intended loss) for just the D4249 and D1510 CDT codes and subtracting 11% of the D4249 entries because there was evidence that restorative

---

[8] The Government's loss figure is conservative in a number of ways, including in that it: (1) is based only on claims actually paid out by Medicaid and does not included intended loss; (2) only includes fraudulent billing for two specific procedures, when there was some quantum of proof indicating that there was other fraudulent billing in the practice as well; and (3) as discussed further below, gives credit for the 11% of CCL procedures that could have even feasibly been actually performed.

procedures were conducted on teeth within 2 months of the purported D4249 procedures. Therefore, U.S.S.G. § 2B1.1(b)(1)(J), applies and increases the offense level by 18 levels because the loss falls between $3,500,000 and $9,500,000. PSR ¶ 31. And, because Price was convicted of a health care offense involving a government health care benefit program – Medicaid – and the loss was more than a million dollars, there is also a two-level increase pursuant to U.S.S.G. § 2B1.1(b)(7).

At trial, the Government introduced the testimony of Federal Bureau of Investigation Forensic Accountant ("FBI FOA") Johanna O'Neill, who testified that she used data provided by D.C. Medicaid to put together summary information of claims submitted by The Smile Center. and paid by D.C. Medicaid for CDT codes D1510 (fixed unilateral space maintainers) and D4249 (clinical crown lengthening, or "CCLs").[9] She prepared several summary exhibits, which were admitted into evidence.[10] *See, e.g.*, Tr. Feb. 2348:9-2385:12. Specifically, Government Exhibit No. 600-65 ("Gov. Ex. 600-65") sets forth the value of the claims paid by D.C. Medicaid to Smile Center. The second page of the exhibit includes a total, by year, of the D.C. Medicaid claims paid for D1510 and D4249 procedures between January 1, 2017, and March 22, 2022 (the dates of the charged conspiracy). The total is $4,118,113, which is comprised of $559,935 in D1510 claims for fixed unilateral space maintainers and $3,558,178 claims for CCLs. *See* ECF No. 1 ¶ 30.

However, in order to make a reasonable estimate of the loss for the D4249 and D1510 claims but also account for procedures that could have been legitimately performed, the Government took into consideration and made the following adjustments to its loss calculation. Specifically, according to FOA O'Neill's summary data, only one D1510 claim was submitted for

[9] The underlying D.C. Medicaid data was produced in discovery.

[10] *See* Gov. Ex. Nos. 600-65, 600-49, and 600-52.

a patient under 21, and the rest were submitted for patients over 21—with an average age of 50. Gov. Ex. 600-49. Adjusting to make a conservative estimate that gives credit for this claim, the total claims paid out for false D1510 claims is $559,751.

FOA O'Neill also testified that Medicaid paid the Smile Center $3,558,178 for D4249 claims. Gov. Ex. 600-52. Adjusting to make a conservative estimate that includes giving credit for these 11% of claims (that is, subtracting $391,399 from the total paid), the total claims paid out for false D4249 claims is $3,166,778.

Thus, the sum of the adjusted D1510 and adjusted D4249 claims set forth above is $3,726,529. This adjusted figure is a reasonable estimate of the loss caused by the first count of conviction in the jury's verdict in this case for each defendant: conspiracy to commit health care fraud. *See* ECF Nos. 187 (verdict form for Defendant Steven Price); 189 (verdict form for Defendant Keidi Moore); *see also* U.S.S.G. § 2B1.1, Application Note 3(B) ("The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence.).

Given the breadth of Price's (and Moore's) scheme, his oversight over the conspiracy, the number of patients and their records involved, the inclusion of the Smile Center employees in his scheme, the frequency of his falsehoods, and the duration of his criminal activity, the nature and circumstances of Price's criminal activity warrants a significant period of incarceration.

**2. The History and Characteristics of the Defendant**

The PSR does not suggest that Price was mentally and/or emotionally incapable of avoiding his criminal conduct; instead, he chose to engage in criminal conduct intentionally and repeatedly because it was profitable. Defendant is a 70-year-old man, who was raised by educated and working parents in a stable middle to upper-income household. He had the benefit of growing up

with siblings and is highly educated having graduated from high school, obtained a bachelor's degree and earned a dental degree from Howard University. At the time of the trial, Price had been a practicing dentist for over thirty years and had a thriving dental practice. Defendant's own witnesses at trial spoke to his stature in the community. But he has let that community down. There is no reason for Price to have committed the offense other than greed. Price knew better than what he did in this case. There are no mitigating circumstances in Price's history that would explain this offense in any way other than simple greed and selfishness, and a complete disregard for the potential consequences not only for himself, but for Moore and other Smile Center employees who he involved in his scheme.

As stated earlier, Price's actions were not an isolated incident. He did not commit a one-time out-of-character mistake. On the contrary, Price was notified by his employees that they noticed the false entries in patients' records and that they were a problem. Price basically ignored his employees and continued to defraud Medicaid. It was not until Medicaid instituted a pre-authorization requirement for D4249 that he and Moore stopped purporting to enter D4249 and D1510 codes for patients.

There is no evidence before the Court that Price has accepted responsibility for his actions or that he appreciates the seriousness of criminal activity.

In order for there to be a sufficient deterrent for Price to cease committing crimes, the Government recommends a within Guidelines sentence of a total term of incarceration of at least 108 months for his convictions of conspiracy, health care fraud, wire fraud and false statements relating to health care matters followed by three years of supervised release, an order of restitution and a criminal forfeiture of specific property and a criminal money judgment.

**3. The Need to Promote Respect for the Law and Deter Similar Criminal Conduct**

A guidelines sentence of incarceration for Price's planned, deliberate, years-long fraud scheme is appropriate to promote respect for the law and to deter other would-be fraudsters, as health care fraud is particularly easy to commit given the huge volume of claims submitted each month (according to trial testimony, over 300,000 claims a month) and the difficulty in detecting false claims. The sentence should reflect the seriousness of the offense, to promote respect for the law, to afford adequate deterrence, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2). A prison sentence of incarceration of at least 108 months would also reflect the volume of claims, longevity of Defendant's scheme, his inclusion of his employees in committing the fraud scheme, the number of patients' records involved, the lack of evidence of remorse, and the abuse of Defendant's position of trust will accomplish the relevant purposes of U.S.S.G. § 3553(a)(2); that is: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; [and] (B) to afford adequate deterrence to criminal conduct[.]" Given Price's background and experience, there does not appear to be any reason for him to have breached the trust of Medicaid, his employees, and patients to enrich himself from the government's coffers.

As important is the Court's consideration of the possible deterrent effect that a sentence in this matter may have on other health care providers contemplating committing this type of fraudulent scheme and ensnaring their employees in the scheme. Section 3553(a) is not limited to the necessary sentence to deter the defendant from engaging in further criminal conduct (specific deterrence) but also includes consideration of deterring other potential criminals from engaging in similar conduct (general deterrence). *See, e.g., United States v. Phinazee*, 515 F.3d 511, 515-16 (6th Cir. 2008) ("The plain language of the statute . . . also militates against limiting the authority of the court to specific deterrence. . . . We note that this conclusion comports with the longstanding

and uncontroversial practice of considering general deterrence in sentencing."). Witnesses at trial described that D.C. Medicaid gets so many electronic claims that it cannot possibly verify the accuracy of each claim and it must rely on the accuracy of providers' submissions. There are consequences to committing health care fraud, and those who steal from the government will be met with significant and just consequences. From the standpoint of general deterrence, a sentence of at least 108 months of incarceration will send a strong message to all who would steal from public coffers to line their own pockets: the risk of getting caught is greater than the reward of quick and easy money.

**4. The Need to Avoid Unwarranted Sentencing Disparities**

Concerning unwarranted sentencing disparities, a sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

For the reasons stated above, Price is not the same nor should he be treated the same as Moore in terms of sentencing. The Guidelines range for Price is much higher than the range for Moore given Price's aggravating roles and as the leader of the conspiracy. Price is squarely with within Zone D, and as such the Guidelines suggest that he should serve a significant term of incarceration. *See* U.S.S.G. § 5C1.1(f).

Finally, according to the PSR, 99% of defendants fitting Price's circumstances received sentence of imprisonment, with the average length of imprisonment imposed being 74 months and the median length of imprisonment imposed being 78 months. PSR, ¶ 111. The Government's

recommendation is in line with sentences imposed in similar[11] healthcare cases. Notably, for example:

- *United States v. Isaia Okoh*, No. 24-cr-20141 (JEL) (E.D. Mich.) (pharmacist sent false claims for prescription drugs that were not ordered by a doctor and were not dispensed to the patient, caused more than **$6 million of loss** to federal and state health care benefit programs, pleaded guilty and sentenced to **80 months**).
- *United States v. Patrick Moore*, 22-cr-00014 (JRH) (S.D. Ga.) (defendant conspired to cause submission of false Medicare claims for medically unnecessary genetic tests; conspiracy billed $24 million to Medicare, **$7.2 million** of which was paid out; pleaded guilty and sentenced to **46 months**).
- *United States v. Kouza et al.*, 20-cr-20430 (GAD) (E.D. Mich.) (pharmacist sentenced to eight years for falsely billing Medicare and Medicaid for prescription medications that were not dispensed, conspired with brother to cause **$15 million of loss**, sentenced after partial verdict to **96 months**).

[11]The Government respectfully submits that the loss computation here differs from the computation in *United States v. Bikundi*, 926 F.3d 761, 797 (D.C. Cir. 2019), where the D.C. Circuit upheld sentences of 120 months and 84 months for co-conspirator defendants who billed $80 million to Medicaid over the course of five years and the entire amount billed constituted the loss for purposes of sentencing. In *Bikundi*, one of the defendants operating the business had been placed on a Medicaid exclusion list under her maiden name, then used her married name to obtain a Medicaid license to provide home health care services. The Circuit Court upheld the district court's use of the total billing amount as the fraud loss, both under the U.S. Sentencing Guidelines and the Mandatory Victims Restitution Act ("MVRA"), because the fraud had so permeated the business that it was not feasible to tell where legitimate services had been performed and where they had not. Here, the Government has computed a much more precise—if conservative—figure of the loss caused by the conspiracy.

- *United States v. Nabil Fakih*, No. 19-cr-20285 (MAG) (E.D. Mich.) (former pharmacist billed Medicare for prescription medications that he did not dispense causing loss of **$4** million; pleaded guilty and sentenced to **46 months**).

This case has a loss amount significantly higher than recent cases where courts in this Circuit have imposed little or no prison time. *See, e.g.*, *United States v. Lushawn Foreman*, 25-cr-00051 (RC) (D.D.C.) (defendant conspired with others to submit false disability claims; caused $81,206 of loss and received Guidelines sentence of 36 months of probation); *United States v. Roland Harris*, 24-cr-00530 (RC) (D.D.C.) (defendant submitted false disability claims; caused $45,215 of loss and received Guidelines sentence of 36 months of probation); *United States v. Armstrong Chapajong*, 25-cr-180 (RDM) (D.D.C.) (defendant fraudulently billed D.C. Medicaid for false behavioral health claims; intended loss of $461,369 and sentence of 24 months' probation). For all of the reasons stated herein, not only does the Government believe that a meaningful period of incarceration is warranted, but we are requesting a Guidelines-compliant sentence of at least 108 months.

**B. The Defendant Should Be Required to Pay Restitution to the Victim**

The crime of mail fraud is an "offense[s] against property under" Title 18, and thus falls under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. As a result, the Court must order that "the defendant make restitution to the victim of the offense[s]." 18 U.S.C. § 3663A(a)(1). The sentencing court determines the amount lost by a preponderance of the evidence. 18 U.S.C. § 3664(e). The Government submits that Defendant owes restitution to D.C. Medicaid totaling $3,726,529.

### C. The Defendant Should be Required to Pay a Forfeiture Money Judgment

"Criminal forfeiture is not an independent substantive offense, nor is it even an element of an offense. It is instead 'an aspect of punishment imposed following conviction of a substantive criminal offense.'" *United States v. Day*, 416 F. Supp. 2d 79, 84 (D.D.C. 2006) (quoting *Libretti v. United States*, 516 U.S. 29, 39 (U.S. 1995)), aff'd in part on other grounds and rev'd in part on other grounds, 524 F.3d 1361 (D.C. Cir. 2008). Criminal forfeiture may take the form of: (1) an *in personam* money judgment against the defendant; (2) forfeiture of specific assets; and (3) forfeiture of "substitute assets" if the directly forfeitable assets are unavailable. *United States v. Zorrilla-Echevarria*, 671 F.3d 1, 5-6 (1st Cir. 2011) (citation omitted). Federal Rule of Criminal Procedure 32.2 governs criminal forfeitures. The Government respectfully requests that the Courtimpose a forfeiture money judgment against Defendant in the amount of $3,726,529 reflecting the amount of proceeds he received from his fraud scheme. A proposed order of forfeiture will be presented to the Court at the time of sentencing.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Government respectfully recommends that the Court should sentence Price to a term of 108 months' incarceration, followed by three years of supervised release, order restitution to D.C. Medicaid in the amount of $3,726,529, and enter an order of forfeiture of a criminal money judgment in the same amount. This Guidelines sentence is appropriate given all of the § 3553(a)factors here. Such sentence would be sufficient but not greater than necessary to achieve the purposes of sentencing.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney
for the District of Columbia

By: ___*/s/ Diane G. Lucas*________________

DIANE G. LUCAS, D.C. Bar No. 443610
SARAH RANNEY, N.Y. Bar No. 5050919
Assistant United States Attorneys
601 D Street NW
Washington, DC 20350
202-252-7724 (Lucas)
202-252-7051 (Ranney)
Diane.Lucas@usdoj.gov
Sarah.Ranney@usdoj.gov